v. M. C. M. V. Jane Barrett. Hear first from Ms. Silver. May it please the Court first I would like to reserve 5 minutes of my time for rebuttal at the end. At the outset, I would like to apologize to the Court. After all the briefing was concluded, the Court requested supplemental briefing from the parties with respect to the specific issue of whether a court may consider evidence extrinsic to a written draft of an IEP, an individual education program, to determine if a school district's proposed IEP offered a free appropriate public education, or whether the Court is limited in its analysis to the written document itself. I realized after I submitted that document that I answered that question perhaps too may be submitted to the District Court after the due process administrative hearing is held should be considered. And actually, however, the issue of whether extrinsic evidence should be considered was addressed in Appellant's reply brief. And in that reply brief, there were cases from a discussion and cases from four Circuit Courts, specifically the Second, the Sixth, the Ninth, and the Tenth Circuit Courts, that answered that question in the negative, saying that extrinsic evidence should never be considered with respect to whether or not a free appropriate public education was provided by a school district, and that the analysis by a court should be limited to the four corners of the document, the IEP itself. And the reason for that is that any offers that are verbally made by a school district in terms of actual implementation are purely speculative if it's just a matter of discussion unless it's in that written IEP document. Well, yes, that doesn't, if you literally apply that, what you would do would be to take out off the table the possibility that the parents simply get up and walk out. The school district says, we can do this, we'll do that, and they leave and pull out. And in those circumstances, you don't look at that, you allow them to turn around and sue? Well, are you, I'm sorry, I'm not following the question, are you asking that a court should not consider if a parent was? I'm just addressing that principle of law. I understand what the Tenth Circuit said, but in the situation, I think it's perhaps here where the assertion is that the parents withdrew from the process, right or wrong, but that they were, in fact, supposed that you have the school representative and they're saying that, yes, we will agree to that and we'll do this, we'll do that, and then they, it's not yet in a plan, but it doesn't get in the plan because the parent pulled out of the process, pulled the child out of school. I'm sorry, Your Honor, but the hypothetical that you are proposing is simply not what occurred. Well, I didn't suggest it was, I said it's a hypothetical. All right, but answer my question. What would you do with that, with the Tenth Circuit rule? Okay, if the parent was being uncooperative. No, I'm just saying, applying the principle that you only look at the written document and it's the ongoing process which the Congress contemplated would be a dialogue and exchange. The school is agreeing with them, we do this, we do that, and we want more. We want to transition this child for another, more time, and so forth, and there's a disagreement about that, but they walk away, and then they challenge, they then want to be compensated for withdrawing the child from school, and they want to be judged, the school to be judged, not about what actually was said and was on the table and they walked away from, but what was in the state of the written document at that time. What do you do with that situation? Well, that question really addresses two separate issues. One is, was the document, the IEP, complete at the time the parents walked away, or did the parents walk away leaving certain parts of the document unfinished, and what were the reasons for that? In this particular case, first of all, the parents did not walk away from the process. It may be, but under the principle of the Tenth Circuit, we wouldn't be discussing any of that. It would simply be, this is, as long as the parents can get up and walk out of these things and not engage in the collaborative process Congress contemplated, it's as long as it doesn't, and they can challenge it without regard to what the discussions were, because it never, you didn't get the plan finalized. Well, even if, and this is not addressed in the Tenth Circuit case, certainly, but even if the parents walked out of a meeting, the school district is still responsible for creating that IEP document. The school district could, in fact, create the document by itself, even if it didn't have the parents' cooperation, even if the parents walked out of the meeting and stated their intent not to return. It would still be the school district's responsibility to create that written document, and that written document, that's what IDEA states, it's supposed to do, the district is supposed to do everything it can to get the parent to the meeting, and then if it can't, the school, it's incumbent upon the school district. If the child is going to attend the school, but if the child isn't going to attend the school, why are we wasting time drafting a document that isn't going to be used? That's just a pure litigation document, then, what you're arguing. If the child isn't going to be in the school, then I agree, you've got to do the IEP, whether the parents show up or not, but if the child is not going to be there, why are we drafting a document about how this child is going to attend classes that they're not going to attend? Well, in this particular case, it was not clear, at the outset at least, whether or not the child was going to attend school in the district. The parents were trying to work with the... Right, that's at the meeting, but after the meeting, when they said, let's reschedule December 20, the parents came back and said, we want you to pay for this other placement, and they said, we won't pay for the other placement, and they said, fine, that's where she's going then. We're putting her in the private school. Was there some indication that they were instead going to come to Rockwall High? After that point, no. Okay, so then what was there for them to be drafting at that point? They had a draft document. You would argue that even when they know the child's going to go to a private school, they should still finish the IEP? It's... They should have finished the IEP until the point where it was clear that there was no possibility that the child would attend the school district. Well, it was pretty... It's a matter of... You're not arguing... ...chicken and egg, which came first. Well, it seems to me that it's... I thought it was very clear in the record, no one was disputing, that after the breakdown over the December 20 rescheduling issue, the parents said, we're putting her back in private school, and they didn't want to come to any more meetings or whatever, not because they were going to put her in Rockwall High, but they just didn't want input, but because they're going to put her in this other school. Right, but the... Or keep her in this other school. Right, but the district court's decision didn't really address what would have happened or what might have happened afterwards had they come back to an IEP meeting. The district court specifically stated that the parts of the IEP that were developed in the December 14th meeting, before the discussion broke down or was postponed until the 20th, which was canceled by the school district, the district court addressed what the district promised orally to the parents, promises that were never incorporated into the written document at all. Why shouldn't the obligation run the other way, on the part of the parents? It's a collaborative process. Why shouldn't they stay with it until they get an IEP? The school didn't stop this. They were still working, but they walked out. Now, you say, well, the school should have gone on and done this pointless exercise. It's not pointless. The parents stay with it and say, let's get an IEP and we'll see what it... Didn't really look at the IEP. You know what the school's going to do, and you can make a judgment, right or wrong. Well, at that point, as of December 20th, the parents knew, because the school district said so, that they would only consider the, its so-called transitions program and would not place the child at DLC. So we're not arguing that what the district didn't do... The school district is not obligated. The school offered a transitions program, which was intended to, a direct response to the difficulty to bring the child back mainstreaming, a transition back to mainstreaming. And that was on the table. They have a transitions program for that. And as I understand it, it's a very favorable teacher-student relationship. There are breaks, they do all these accommodating things, many of the same things they've done in the private school. That was the transitions program they walked away from. Now, what you're saying is that the offer of a transitions program should not be considered because they hadn't put it in an IEP. No, Your Honor. With all due respect, the transitions program that was offered by the school is not what you just described. Well, it may not be, but what I'm saying is that you walked away from the transitions program, but you're resisting the transitions program here because you're saying that it wasn't in the IEP. No, Your Honor. The transitions program was resisted simply because it was not reasonably calculated to provide a free, appropriate public education to the child. The whole scenario of the transitions program was purely speculative. But so your whole argument is the school district should have simply agreed to pay for this second semester at the school, and you don't need an IEP for that at the other school, at the private school. You don't need an IEP to send somebody to private school. No, again, Your Honor, with all due respect, the argument is not that the school district should simply have agreed to pay for the second semester at a private school. The argument is that the parents were willing to work with the district to find a way to bring her back. No, two minutes ago you said the problem was the parents realized they weren't going to pay for the private placement. They wanted to put her in the transitions program. So that was the problem that the parents reacted to by putting her in the private school. That sounds pretty all or nothing to me. That sounds like the parents are wanting the private school placement for that semester. That's what they said at the meeting. That's what they said later. And that's what they did. No, they never said at the meeting that they would only accept the private school. No, but that's what they asked for. They said, we don't want to do something midstream. Let's let her finish out the year. You all pay for that, and we'll worry about next year. Well, that was on the table. And then after that meeting, they never suggested there was anything short of that that they would accept, right? Did they ever say, oh, well, we will go to the transitions class? No, they never did. Let me ask you then to address the question of even assuming that the IEP was, we can only look at the written document at one adequate, blah, blah, blah, you still have the problem of 34 CFR 300.148D.3, which is if the parents act unreasonably, reimbursement can be denied. What is your response to that, whether they acted unreasonably? My response to that is the parents certainly did not act unreasonably in this case. The parents were willing to come to the meeting on December 14th to discuss the possibility of re-enrolling the child in the school. That didn't, that was their intent to consider what the district had to present, and if the school, which the district representatives went and observed, if they could reasonably replicate that at the public school, they would be perfectly willing to return their daughter to the school. That was the Pirate School, that private placement, and the situation there was where their daughter had been successful, and the public school program was where their daughter had not been successful in the past. It's not unreasonable of them to want to at least have some of what was in the private school placement replicated in the public school. The school district made all kinds of promises about what it would or would not, or what it would do in terms of replicating the private school, but none of that actually, and it was discussed at the December 14th meeting, but none of that actually made its way into the IEP document that came out of that December 14th meeting. This is where they went awry. At that point, they acted on the bias of counsel and pulled out. Am I wrong? I'm sorry, I didn't hear the question. At that point, they were, were they told at that point, and I don't want to bar your attorney client privileges, but they suddenly pulled out. I think that was a fundamental mistake, and I'm, under the law, I understand the parents' concern. I respect that. They're caring. They're loving their child. I respect that, and they're doing what they should do for their child. At the same time, the law definitely does not impose this obligation on the state to do more than mainstream them in an appropriate way. You just disagree with the transitions program and the adequacy of it. May I answer the question, Your Honor? Sure. The reason why the parents pulled out of discussions with the school district was because of the December 20th letter from Ms. Kathy Honeycutt, who's a special education director, I believe, to the parents, stating that the school district would not consider the private school placement for the child. And at that point, they had an incomplete IEP that was not reasonably calculated to provide FAPE, and the school district's promises, verbal promises that had occurred in that December 14th meeting were not in the document. What that letter says is that we're not going to pay. We think that what we're providing here is adequate and implicit, and that, as always, we're not going to pay for your private school placement. What happens is, when they tell you they're not going to pay for the private placement, what that tells me is that that's what the parents wanted, and understandably so. And when they found out that they were not going to, they then... No, Your Honor. It was not just that the school district would not provide the private placement. The other factors, the fact that the IEP that the school district offered would have been  passed, and the fact that the parents felt that they were lied to at the ARD meeting by the school district, which the school district made representations or said they were going to do things, that did not ultimately end up in the final IEP. Your Honor, I think you've answered the question and exceeded your time, but you will have some time on rebuttal. Thank you. Thank you, Your Honor. Ms. Davis. Please, the Court. My name is Brandi Davis, and I'm here on behalf of Rockwall ISD. The first point I wanted to just pick up on what Ms. Silver was saying about the December 20th letter, and I just wanted to point out to the Court that that letter was sent at the behest of the parents. The parents actually had contacted the school between meetings and said, tell us if you will agree to private school, because we're not coming back unless you tell us right now. And therefore, the Director of Special Education at that point sent a letter and said, right now, we are not going to agree to that. However, let's go back and meet in January, and we're willing to consider more information. So, the school district was not, at that point when the meeting ended in December, had not said no to private school, because the meeting hadn't ended. They hadn't gotten to the place where everybody said, okay, here's what the plan is, because it was still incomplete. And so, I just want to point out that that letter was kind of a response, because the  for a answer right then and there. The district court correctly found that the parents had taken a take it or leave it approach at that point between the meetings. Did that letter intimate that the school board would not negotiate further? The letter itself said that we'll continue to discuss this at the meeting when we come back to meet in January. Okay. So, it was still on the table. Until an IEP is finalized, all of those kinds of things can be changed. Which is the problem that brings us here today, is that the IEP was not finalized. In order for parents to recover private school tuition... Let me ask you this. Can we obviate the need to decide whether we like the Tenth Circuit's approach or the First Circuit's approach by finding that the parents' conduct was unreasonable? Yes. Or if we found it was unreasonable, would that obviate would be a better way to put it? Absolutely, because the IDA written right into the law says that if a parent's act unreasonable, a court can deny a request for reimbursement. Is that in essence what Judge Boyle decided? Well, Judge Boyle did find that they acted unreasonable, but on top of that, Judge Boyle did go ahead and discuss the fact that what was offered to the parents, to the student in this case, was a free, appropriate public education based on what was in the draft IEP, what was actually in the document, and looking at the four factors that you determined FAPE underneath. And then also looking at the extrinsic evidence following the First Circuit's lead in saying that in a situation when an IEP is not yet complete, it doesn't make sense to only look at what's in that draft document. It's like what Judge Higginbotham was saying in his question to Ms. Silver. When parents get up and walk out, what's left for the school district to do? In this case, the student had not actually been enrolled in Rockwell ISD at that point, had only told the school that they were planning on bringing her back. So at that point, the school, the school had not received any enrollment documentation from the student, and by the time that everything fell apart, before they came back to meet in January, they were told, we are placing this child in a private school, and so there was no obligation. When was scheduled to start for the spring semester? I believe it was going to start in Rockwell ISD a few days sooner than when it was going to start at the private school. What's that date? Because their argument is that scheduling the meeting for January 2nd or 3rd is too late because it's fixing to start, so I'm asking when was school going to start up again? It was either the 5th or the 6th for public school, and Dallas Learning Center wasn't going to start until the 9th. So the one date that was offered, the 3rd, was definitely... I mean, back in my day, you had to like register for classes and stuff like that. Can you just show up on January 3rd and register for January 5th classes? Or was she going to be in the transitions and that's just some different world, so it didn't matter? When a student shows up to enroll, the school district is obligated to get them in there as soon as possible. Wow, I wish I'd known that a hundred years ago when we would rush back to do all the registrations. And as far as timing, one thing that was noted in our brief was that there are no regulations for a student with special needs coming from a private school. But a student that's coming from another public school, it's written into the law that the school has up to 30 days to either adopt the other school district's IEP or develop a new IEP. So the law is already contemplating that schools can have a little bit of time to get this new... Well, they're saying you already ran out the clock by waiting so long to schedule the original meeting. That they, mid-November, said, hey, we're back, and y'all scheduled the meeting for like December 14th, which they said was already... Well, there was a week of Thanksgiving holiday, other things going on, but Judge Boyle did find that there was no evidence of any unreasonable delay or that the school district was acting unreasonably when they actually scheduled the meeting. And so I don't think that the appellant has... And that reminds me, I've been looking at this, and I couldn't find a really clear answer. We have a lot of cases where we're reviewing a summary judgment from the district court where we say we review findings for clear error, which isn't what you typically do in a summary judgment. Judge Boyle kind of said, well, summary judgment's the vehicle by which I make these findings and sort of suggested that it's a different animal. Is that accurate? I mean, so we don't use the usual summary judgment standard of inferences in favor of the non-moving and all that? Are you talking about the standard of her reviewing the hearing officer? No. I'm talking about we are reviewing Judge Boyle. Yes. And normally on a summary judgment, you give zero deference to what the district court did. We have a bunch of cases that are reviewing summary judgments that say we review the underlying factual findings for clear error. Maybe they mean the administrative officer. I thought they meant the district court. I don't know. What are we reviewing under what standard in a summary judgment? In the line of these cases, summary judgment cases involving special education, the court has said the underlying facts are reviewed for clear error. The underlying facts as found by the district court even in a summary judgment? Yes, ma'am. Okay. Yes, Your Honor. And so the first, and the burden, of course, is on the person attacking the school's program. So the burden is on the petitioner to show that the school district could not offer free appropriate public education. And the court correctly found that, in fact, looking at what was offered, that a FAPE was offered under the four FAPE factors. It's, you know, individualized based on student's assessment and programs administered in least restrictive environment. Programs administered, services are provided in a coordinated and collaborative manner. That's that meaningful participation piece. And then that positive academic and non-academic benefits are demonstrated. There's only two of those factors that were actually briefed in the appellant's brief. And so we're just looking at whether it's individualized on the basis of the student's assessment and performance, and then the meaningful, whether the parents were allowed to collaborate and meaningfully participate in the development of the program. And when you look at those issues, the court correctly found that the preponderance of the evidence showed that the proposals were based on a variety of sources, including the parents' concerns throughout the meeting. The school district asked the parents, you know, is this what you want? Is this what would work? They looked at what was working at the private school. And I disagree. What happened to this student after the sophomore year? She, she stayed, this year, that year she stayed in the private school. She graduated from there now? She actually ended up returning to the school district and graduated early. Okay, so I thought you said she stayed at the private school. She stayed for that duration. I understand that, the second semester. I said after her sophomore year. She was a sophomore that year. Then she returned to Rockwell ISD. She went and was successful? She was successful and graduated early. Okay. And so, based on what was offered, everything that is on the record shows that the school district did consider what they needed to consider as far as the student's, the student's needs. They wrote all those things into the plan. There were some things that were left out, although they were discussed, which this meeting was recorded and transcribed, and so we know exactly what was said. This is a little different from a situation which somebody says that somebody made an oral offer, and then there's nothing to back it up. Everything was put in emails, in writing, was said and recorded at the meeting, later transcribed. So the underpinning to the Tenth Circuit case isn't present here. That is, we don't want to rely on verbal stuff because that can be misconstrued. Correct. Because we know what the verbal stuff was because it's been reduced to writing in the form of a transcript. Correct. It's much more in line with what happened in the First Circuit case. In that case where we had a parent who got very fixated on a private residential placement and withdrew from the process before the IEP was completed. And I think it's disingenuous to argue that the school district should have come back and met and completed an IEP when they're at the same time arguing that they weren't able to meaningfully participate and then say, well, you should have gone ahead and done it without us, and you should have put this plan in place. I don't, I think she finally agreed that if you absolutely knew that they're going to private school, that there isn't a reason for it. And I think reading the correspondence from the parent, I don't know how you could suggest that the school district couldn't, that it wasn't clear. Because the father actually said, tell us that you're going to agree with the proposal to keep the student in private school or we're not coming back. Our attorney told us that we don't need to come back. And the facts also show that this was really the plan all along, because even at the hearing the mother testified that when they reached that settlement agreement, which was in October only two months before, that we're in the school district agreed to pay for private school through the December, she testified that they, quote, desperately did not want the student to have to return in the middle of the year. And then here they come in November, and it's the middle of the year, and they bring a prepared letter from the director of the private school, the Dallas Learning Center letter, that says we really think she needs to stay here because it's not good to change in the middle of the year. And then later at the hearing, the director actually said that they designed their program to be on a semester-by-semester basis so that students can easily transition. That was spring of what year? I'm sorry? Spring of what year was that? Spring of 2012 is when the student would... And then the student returned to the public school? The following fall. Oh, so... And that was after this case. So the only thing really at issue is whether or not the school board must pay for that expenses of that private school during the spring of 2012. That spring semester. And although you say... Except you do make an argument about a breach of contract. Are you giving up on that? That wasn't an issue for appeal. We did not appeal it. So, yeah, we've moved on from the breach of conduct based on the settlement agreement. And I will say that it's not just that the school board doesn't want to pay. It's really a decision regarding what's appropriate for the student is made by the ARD committee. And that's supposed to be the parents, the teacher, any specialists. In this case, the student was going to be receiving counseling services. So it's a team of people that know the student. The precedent here goes beyond simply however many thousands of dollars are at stake because obviously it would govern how all school districts in the Fifth Circuit, presumably, if we issued a public opinion, would have to address these kinds of circumstances. Absolutely. This isn't the first time in the history of mankind that parents have disagreed with a school over what to do with their child. Sure. And the cases are really clear that what the school has to offer a special education student is an IEP, a program that provides a meaningful educational benefit. We don't have to give you the Cadillac. We don't have to give you the very best. There's always going to be some private school out there that's probably amazing. In this case, we don't find that this private school actually is appropriate for the student. But there's always going to be something out there. Just because that school may have things that are bigger and shinier and better than what the public school has to offer. I think we all understand. I mean, I don't think she's disputing that. Absolutely. But I do understand. I mean, honestly, however this case comes out, I understand the parents, you know, fighting for the very best they can get for their child. I totally understand that. And that is really the heartbreak of a lot of these cases is the law doesn't allow for the Cadillac. But as a parent, you want that. I want that. Not the physical Cadillac, but that education for your child. I mean, I totally get that. I agree and I understand that as well. But I don't think that in this case that the parents acted reasonably or really in good faith any effort to collaborate. I think they came with the plan to try to get the student back in the private school for that spring semester because they did not want to have to withdraw her in the middle of the year. And they weren't really willing to listen to anything else. Whereas the school district sat there. They had a six-hour meeting. And at the end of the six-hour meeting, that's when they bring out the letter and say that this is what they want. They're going to come back and finish the meeting. And the parents pulled out. If we find that, you know, that that is enough for parents to be able to recover private school tuition, I do think that that does set a bad precedent because it really encourages parents to… I think we understand that. Absolutely. And then I just wanted to say, in addition to the fact that I do think that the district court did a very good job of outlining the reasons and the underlying facts for why the school district did offer a free appropriate public education, which in itself would bar the parent from being able to recover tuition. And the parent also acted unreasonably. We've discussed that and how they behaved. It is important to also look at the private school has to be appropriate. And it's the burden is on the parents to show that the private school is appropriate. And I do believe that we have… And Judge Bull actually decided not to answer that question because she didn't feel like it was necessary. But the parties agreed that the student required counseling. And I think you can't find that a school is appropriate if they don't offer one of the very important services that everybody agrees that the student needs. And so that's the one other piece that I think is very important. Thank you. Thank you, Ms. Davis. Ms. Silver? Thank you. I would just like to address two points that the school district made in its argument. First of all, the school district stated that the parents were not really ready to listen to anything except a private school placement for their daughter. That is patently incorrect. The evidence does not support that statement. There's no secret that they preferred the private placement. They stated that throughout their discussions with the school district. They were not trying to hide the ball in any way. However, just because they had that preference for the private school doesn't mean that they were unwilling to listen to what the school district was proposing. Those are not one and the same. And the second point is, as stated, timing was extremely important here. The fact that the school district wanted to postpone the continuation of this ARD meeting until early January, literally just a day or two before school was about to resume. You have to understand, you have to consider the background here. This young lady was emotionally disturbed. That's why she was in special education in the first place. She had a history of being unsuccessful at this school district. She became school phobic. She was placed in a psychiatric institution as a result of this. The parents were extremely fearful that she might relapse if she did not come back to the school district under circumstances that would at least give her a chance to succeed. And there wasn't any clear evidence at the ARD meeting that the school district would do anything to help her succeed. And then the school district, in that December 20th letter, completely foreclosed the possibility of the private school. The parents felt that coming back to an ARD meeting in January would be, frankly, a waste of time and useless. And not only that, the school district had indicated that, which is rather disingenuous, that the only reason it was postponing the meeting was to have its attorney there because these were supposedly unique circumstances. These were not unique circumstances. There's nothing unique about a public school making a private placement of a school under IDEA. The school district didn't need to have its attorney there. They simply were... Do you have any proof that this was not unique for the Rockwall school? I mean, Rockwall's a small area. It's not a huge school district like Dallas. Do you have any evidence that this wasn't unique for them? That they're lying about that? Off the top of my head, no, Your Honor. In this record, not your head. This record. Not in this record, but surely the school district had to be aware of IDEA and unique situations. Well, I'm sure they're aware of it, but you're acting like they've had this every other day. I'm not sure that's true in a school district of this size. They probably have had other cases. Good reason to have a lawyer there. Well, IDEA... It tells you a lot about the spirit with which you're going about this. This is supposed to be a collaborative process between the parents and the school, and it escalated to the point that the school district was having an attorney there, and it's all being recorded. That's hardly a conducive statement. I think we have your argument. Thank you. Your Honor, with all due respect, IDEA discourages attorneys coming to ARD meetings, specifically discourages it by not allowing attorneys' fees for attendance of attorneys at ARD meetings. And the parents did not have an attorney at the December 14th meeting, had no intention of bringing an attorney when they were supposed to come back to the December 20th meeting, which was canceled by the district because it wanted to have its attorney. If there was any faith here, it was not on the part of the parents. I would respectfully submit that it was on the part of the school district that wanted to simply up the ante here, make it difficult for the parents, financially, to come to this meeting with having a level playing field. And then, as I started to say before, you have to consider what would have happened had they come back in early January and come to that meeting. If there was no IEP put in place at that meeting, and as opposing counsel represented, the school district would have 30 days to put a plan in place, what was going to happen to this emotionally disturbed child in those 30 days? The parents considered that at great length before they decided not to return to the January meeting. Thank you. Thank you, Ms. Silver. Court will recess for approximately 10 minutes.